# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 15-2404

BOBBY L. BANKHEAD, APPELLANT,

V.

DAVID J. SHULKIN, M.D.,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Decided March 27, 2017)

*Glenn R. Bergmann*, of Bethesda, MD, was on the brief for the appellant.

*Leigh A. Bradley*, General Counsel; *Mary Ann Flynn*, Chief Counsel; *Richard A. Daley*, Deputy Chief Counsel; and *Mark D. Gore*, all of Washington, D.C., were on the brief for the appellee.

Before SCHOELEN, BARTLEY, and GREENBERG, *Judges*.

BARTLEY, *Judge*: Veteran Bobby L. Bankhead appeals through counsel an April 28, 2015, Board of Veterans' Appeals (Board) decision granting a disability evaluation of 50%, but no higher, for service-connected major depressive disorder, claimed as post-traumatic stress disorder (PTSD).[1] Record (R.) at 2-46. This appeal is timely and the Court has jurisdiction to review the Board decision pursuant to 38 U.S.C. §§ 7252(a) and 7266(a). The case was submitted for panel consideration to examine the term "suicidal ideation" in 38 C.F.R. § 4.130's criteria for a 70% disability evaluation for a service-connected mental disorder. For the reasons that follow, the Court

---

[1]Inasmuch as the Board's grant of a 50% evaluation is favorable to the veteran, the Court will not disturb it. *See Medrano v. Nicholson*, 21 Vet.App. 165, 170 (2007) ("The Court is not permitted to reverse findings of fact favorable to a claimant made by the Board pursuant to its statutory authority."). The Board also remanded claims for service connection for hearing loss and tinnitus. R. at 44-46. Because a remand is not a final decision of the Board subject to judicial review, the Court does not have jurisdiction to consider those matters at this time. *See Howard v. Gober*, 220 F.3d 1341, 1344 (Fed. Cir. 2000); *Breeden v. Principi*, 17 Vet.App. 475, 478 (2004) (per curiam order); 38 C.F.R. § 20.1100(b) (2016).

will set aside the portion of the Board's April 28, 2015, decision denying an evaluation in excess of 50% for major depressive disorder and remand that matter for readjudication consistent with this decision.

## I. FACTS

Mr. Bankhead served on active duty in the U.S. Army as a medical cast specialist from July 12, 1965, to July 11, 1967. R. at 797. He was stationed stateside, but reported that he attended to severely injured servicemembers who had been medically evacuated from Vietnam and that he had been traumatized from witnessing their wounds. R. at 612.

In December 2009, Mr. Bankhead received VA treatment for depression, feelings of worthlessness, sleep impairment, and difficulty paying attention. R. at 905. The attending physician noted that the veteran had been most depressed and actively suicidal four or five years prior to the date of examination and that he had been "chronically suicidal and low-grade" for many years. R. at 899. Mr. Bankhead denied having an intent or plan to commit suicide, but stated that he "thinks of death several days a week." *Id*. He also indicated on a patient health questionnaire (PHQ) that he experienced thoughts that he would be better off dead or of hurting himself "[m]ore than half the days." R. at 901. The attending physician ultimately concluded that Mr. Bankhead was not currently suicidal but counseled him on suicide prevention. R. at 899, 901. At a follow-up mental health evaluation later that month, the veteran stated that he frequently thought about death, but asserted that he did not entertain any plans or desire to commit suicide. R. at 881.

In January 2010, Mr. Bankhead told his VA treating physician that, prior to beginning treatment in September 2009, he had requested a gun from his wife to "blow his brains off" and that his wife subsequently removed the gun from their home. R. at 855. He also reported irritability, short temper, poor memory, and dreams and flashbacks about patients he treated while in the military. *Id.* Mr. Bankhead completed a PHQ indicating that he regularly experienced anhedonia, depression, irregular sleep, tiredness, poor appetite, feelings of self-deprecation, trouble with concentration, and thoughts of death or hurting himself "[n]early every day," which made his work life, home life, and interpersonal interactions "very difficult." R. at 855, 857. An accompanying suicide risk assessment reflects that the veteran had current thoughts about suicide or self-harm but

2

no intent, plan, or means of acting on those thoughts. R. at 737, 739. He stated that he previously had thoughts of "blowing his brains out" and "last was suicidal" two months earlier; however, he noted numerous protective factors against suicide, including positive future plans, positive social support, a sense of responsibility to family, religious beliefs, positive coping skills, and a therapeutic relationship. R. at 739. The veteran's risk of self-harm was assessed as low. *Id*. The treating physician diagnosed, inter alia, major depressive disorder, with "chronic suicidal ideation" listed as a preliminary problem. R. at 863, 865.

In February 2010, Mr. Bankhead was referred for a VA psychosocial assessment due to depression, insomnia, nightmares, and constant thoughts of death. R. at 711. He reported thoughts of suicide but stated that religious convictions kept him from acting on those thoughts. *Id*.; *see also* R. at 717. At a follow-up appointment later that month, Mr. Bankhead denied suicidal ideation, but admitted that he had entertained thoughts of suicide as recently as two weeks ago, that he had recently found the gun his wife had hidden, and that he had a box of ammunition, although the gun was "not loaded all the way." R. at 703. He stated that he wanted to be around to see his grandchildren and called his wife from the office to tell her to give his gun to a family member. R. at 703, 705.

In March 2010, Mr. Bankhead filed a claim for service connection for PTSD, among other conditions. R. at 781-96. VA treatment records from that month reflect the veteran's description of himself as "suicidal," R. at 699, and his reports that he continued to experience "fleeting" suicidal ideation without intent or plan and had been "'fighting demons' for quite some time," R. at 689, 691.

At an April 2010 VA mental health appointment, Mr. Bankhead reported waking up the night before and attempting to choke his wife in her sleep. R. at 681. He denied suicidal and homicidal ideation at that time, *id*., later that month, R. at 677, and in May 2010, R. at 661. During a May 2010 VA outpatient mental health treatment planning session, it was noted that the veteran had occasional suicidal or homicidal ideation and was at an increased risk of suicidal behavior. R. at 657.

In September 2010, Mr. Bankhead underwent a VA psychiatric examination. R. at 607-19. Although the veteran denied suicidal intent or plan, he complained of chronic suicidal ideation, including "ruminative thoughts about death," feeling that "life is empty," and "wonder[ing] if it's worth living." R. at 613-14. The examiner noted that Mr. Bankhead experienced panic attacks,

anxiety, depression, irritability, difficulty sleeping, nightmares, disinterest in activities, and social detachment, which caused "clinically significant distress or impairment in social, occupational, or other important areas of functioning." R. at 614-15. With specific regard to impact on employment, Mr. Bankhead reported that he was a "loner" in his previous job as a mail handler for the United States Postal Service (USPS), that he had experienced occasional problems with co-workers, and that he called in sick more frequently toward the end of his career because he lacked motivation to go to work and was "tired of management and people." R. at 616. The examiner indicated that the veteran exhibited daily depressed mood, sleep difficulties, psychomotor impairment, fatigue, feelings of worthlessness or guilt, and suicidal ideation, and diagnosed moderate, recurrent major depressive disorder. *Id.*

During VA mental health treatment in February 2011, Mr. Bankhead indicated that he thought about death and dying, but not about causing his own death, and denied suicidal ideation. R. at 26-27.[2]

In March 2011, a VA regional office (RO) granted service connection for major depressive disorder, claimed as PTSD, and assigned a 30% evaluation effective March 11, 2010, the date of the veteran's claim. R. at 1072-85. Mr. Bankhead timely filed a Notice of Disagreement as to that decision in June 2011. R. at 539.

In the meantime, a May 2011 VA outpatient mental health treatment plan noted that the veteran was at an increased risk of suicidal behavior, even though he denied suicidal ideation at the time. R. at 1328-29. He also denied suicidal ideation in May, July, November, and December 2011. R. at 27-29. However, in August 2011, Mr. Bankhead told a VA nurse practitioner that he would "sometimes think about 'ending it,'" even though he would not act on that impulse because of his family. R. at 28. The nurse practitioner found that the veteran was at a low risk for self-harm or harm to others. R. at 29.

In January 2012, Mr. Bankhead reported to a VA nurse practitioner that he occasionally thought that "life is not worth living" and that he previously considered drinking antifreeze, but asserted that his religious beliefs–namely, his fear of divine retribution for committing suicide–and

---

[2] The record before the Court does not contain copies of these and other treatment notes. In those instances, the Court's description is based on the Board's discussion of those notes in its decision.

his devotion to his family kept him from acting on his suicidal thoughts. R. at 205. It was noted that the veteran was "not at any increased risk of suicide." R. at 208. During VA outpatient mental health treatment the following month, Mr. Bankhead reported a "recent episode of anger" for which the police were almost called on him. R. at 199. Nonetheless, he was declared "safe for continued [outpatient] care" and not considered to be an increased risk for suicide or harm to another. R. at 202.

At another VA outpatient mental health visit in May 2012, Mr. Bankhead reported occasionally feeling "down and out" and having fleeting thoughts that he "should 'just take himself out,'" although thinking about family helped relieve that ideation. R. at 192. He remarked that he had recently told his wife that he could obtain a new gun if he wanted to kill himself, but he clarified to the treating nurse that he had been kidding. *Id*. The nurse counseled him on what to do "if thoughts of suicide extend[ed] beyond brief periods." R. at 193. In September 2012, Mr. Bankhead told a VA examiner that he continued to experience passive suicidal ideation without intent or plan. R. at 492.

In November 2012, the RO issued a Statement of the Case (SOC) that continued the 30% evaluation for major depressive disorder, R. at 455-84, and Mr. Bankhead perfected an appeal to the Board, R. at 440-41. Later that month, the veteran sought VA mental health treatment and denied thoughts of self-directed violence or suicide. R. at 180. He was assessed as a low suicide risk. R. at 181. He also denied suicidal ideation during December 2012 VA psychiatric treatment. R. at 34.

In February 2013, the RO issued a Supplemental SOC (SSOC) continuing to deny an evaluation greater than 30% for major depressive disorder. R. at 432-37. Later that month, Mr. Bankhead sought additional VA mental health treatment and reported a recent incident in which he retrieved two knives and threatened to cut his son's head off. R. at 166. He also stated that, although he did not threaten to fight or kill his wife, he would frequently snap at her. R. at 167. The attending nurse practitioner noted that the veteran was "often unexpectedly" irritable and that his impulsiveness impacted his relationships. R. at 167-68. However, she noted that he had a low risk of self-harm because he expressed a desire to live, a commitment to his family, and a proactive role in removing access to his gun. R. at 169. The nurse practitioner recommended enrolling Mr. Bankhead in an anger management program. R. at 164. In April 2013, Mr. Bankhead attended two sessions out of

5

a twelve-session anger management program, R. at 149, 151, and in June 2013, he expressed a desire to reenter that program, R. at 139. He attended anger management classes from July to October 2013, and no current suicidal or homicidal ideation was reported. R. at 36, 129, 131, 133. Additional anger management classes were recommended in May 2014, but the veteran postponed them. R. at 114.

In the meantime, the RO issued an SSOC in December 2013 continuing the 30% evaluation for major depressive disorder. R. at 59-73. During VA treatment later that month, Mr. Bankhead did not report suicidal or homicidal ideation and he was deemed to be a low risk of harm to himself or others. R. at 37. Similar assessments were rendered in May and October 2014. R. at 95, 114.

In September 2014, the Board remanded Mr. Bankhead's claim for further development, including to provide a new VA psychiatric evaluation. R. at 277-83. In that examination, performed in November 2014, the examiner diagnosed moderate and recurrent major depressive disorder. R. at 1132. Mr. Bankhead reported regular irritability and agitation, continued difficulty sleeping, depression, poor memory, and withdrawal from social interaction, but denied suicidal and homicidal ideation. R. at 1134-35.

In April 2015, the Board issued the decision on appeal. R. at 2-46. The Board determined that Mr. Bankhead's service-connected major depressive disorder merited a disability evaluation of 50%, but no higher. R. at 39. The Board recognized that the veteran exhibited many of the symptoms related to a higher disability evaluation, including suicidal ideation, irritability, difficulty sleeping, depression, social isolation, panic attacks, and memory impairment. R. at 39. Nevertheless, the Board concluded that those symptoms did not manifest with sufficient frequency and severity to meet the criteria for a higher evaluation. R. at 40. Additionally, it reasoned that Mr. Bankhead's symptoms did not create the level of occupational and social impairment with deficiencies in most areas contemplated in the criteria for a 70% evaluation, nor did they create the total occupational and social impairment required for a 100% evaluation. R. at 40. This appeal followed.

6

## II. ANALYSIS

### A. Evaluation for Major Depressive Disorder

Mr. Bankhead first argues that the Board either clearly erred in denying an evaluation in excess for 50% for service-connected major depressive disorder or provided inadequate reasons or bases for doing so. Appellant's Brief (Br.) at 12-23; Reply Br. at 1-8. He asserts, inter alia, that the Board mischaracterized his suicidal ideation as wholly "passive," conflated suicidal ideation with risk of self-harm, and failed to adequately explain why fluctuations in suicidal ideation and impaired impulse control did not, at a minimum, warrant the assignment of staged evaluations. Appellant's Br. at 18, 20-23; Reply Br. at 4-8. The Secretary disputes these contentions and urges the Court to affirm the Board's denial of an evaluation in excess of 50%. Secretary's Br. at 3-15. For the reasons that follow, the Court agrees with the veteran that the Board provided inadequate reasons or bases for its decision.

### 1. Applicable Law

Mental disorders are evaluated as 50% disabling when they cause

> [o]ccupational and social impairment with reduced reliability and productivity due to such symptoms as: flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short- and long-term memory (e.g., retention of only highly learned material, forgetting to complete tasks); impaired judgment; impaired abstract thinking; disturbances of motivation and mood; difficulty in establishing and maintaining effective work and social relationships.

38 C.F.R. § 4.130, Diagnostic Code (DC) 9411 (2016). To qualify for the next higher evaluation of 70%, a mental disorder must manifest with

> [o]ccupational and social impairment, with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood, due to such symptoms as: suicidal ideation; obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriately and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a worklike setting); inability to establish and maintain effective relationships.

*Id.* And, a 100% evaluation is warranted where the evidence shows that a mental disorder causes

7

[t]otal occupational and social impairment, due to such symptoms as: gross impairment in thought processes or communication; persistent delusions or hallucinations; grossly inappropriate behavior; persistent danger of hurting self or others; intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time or place; memory loss for names of close relatives, own occupation, or own name.

*Id.*

Use of the term "such symptoms as" in § 4.130 indicates that the list of symptoms that follows is non-exhaustive, meaning that VA is not required to find the presence of all, most, or even some of the enumerated symptoms to assign a particular evaluation. *Vazquez-Claudio v. Shinseki*, 713 F.3d 112, 115 (Fed. Cir. 2013); *see Sellers v. Principi*, 372 F.3d 1318, 1326-27 (Fed. Cir. 2004); *Mauerhan v. Principi*, 16 Vet.App. 436, 442 (2002). However, because "[a]ll nonzero disability levels [in § 4.130] are also associated with objectively observable symptomatology," and the plain language of the regulation makes it clear that "the veteran's impairment must be 'due to' those symptoms," "a veteran may only qualify for a given disability rating under § 4.130 by demonstrating the particular symptoms associated with that percentage, or others of similar severity, frequency, and duration." *Vazquez-Claudio*, 713 F.3d at 116-17. Section 4.130 "requires not only the presence of certain symptoms" but also that those symptoms have caused the level of occupational and social impairment associated with a particular disability evaluation. *Id*. at 117. Therefore, although the veteran's symptoms are the "primary consideration" in assigning a disability evaluation under § 4.130, the determination as to whether the veteran is entitled to a particular evaluation "also requires an ultimate factual conclusion as to the veteran's level of [occupational and social] impairment. . . ." *Id*. at 118.

The Board's determination of the appropriate degree of disability is a finding of fact subject to the "clearly erroneous" standard of review set forth in 38 U.S.C. § 7261(a)(4). *See Smallwood v. Brown*, 10 Vet.App. 93, 97 (1997). "A factual finding 'is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Hersey v. Derwinski*, 2 Vet.App. 91, 94 (1992) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). When there is a question as to which of two evaluations apply, "the higher evaluation will be assigned if the disability picture

8

more nearly approximates the criteria required for that rating. Otherwise, the lower rating will be assigned." 38 C.F.R. § 4.7 (2016).

As with any finding on a material issue of fact and law presented on the record, the Board must support its degree-of-disability determination with an adequate statement of reasons or bases that enables the claimant to understand the precise basis for that determination and facilitates review in this Court. 38 U.S.C. § 7104(d)(1); *Gilbert v. Derwinski*, 1 Vet.App. 49, 52 (1990); *see Mittleider v. West*, 11 Vet.App. 181, 182 (1998) (explaining that the need for adequate reasons or bases is "particularly acute when [Board] findings and conclusions pertain to the degree of disability resulting from mental disorders"). To comply with this requirement, the Board must analyze the credibility and probative value of evidence, account for evidence that it finds persuasive or unpersuasive, and provide reasons for its rejection of material evidence favorable to the claimant. *Caluza v. Brown*, 7 Vet.App. 498, 506 (1995), *aff'd per curiam*, 78 F.3d 604 (Fed. Cir. 1996) (table).

*2. Background on Suicidal Ideation*

Suicidal ideation is one of the symptoms associated with a 70% disability rating. The Court notes longstanding public concern over the prevalence and risk of suicide among veterans. *See* Armen Keteyian, *Suicide Epidemic Among Veterans*, CBS NEWS, Nov. 13, 2007, http://www.cbsnews.com/news/suicide-epidemic-among-veterans-13-11-2007/. A 2016 study found that in 2001 an average of 19 veterans died per day by suicide. DEP'T OF VETERANS AFFAIRS, SUICIDE AMONG VETERANS AND OTHER AMERICANS 2001-2014, at 22 (Aug. 3, 2016). That number increased to 21 per day in 2010 and has held steady at 20 per day from 2011 to the present. *Id*. In 2010, veterans accounted for 20.2% of all U.S. deaths by suicide, but represented 9.7% of the total U.S. population. *Id.* at 4. Although VA has undertaken measures to help prevent veteran suicide, *see* DEP'T OF VETERANS AFFAIRS, VA SUICIDE PREVENTION PROGRAM: FACTS ABOUT VETERAN SUICIDE 1-7 (July 2016)*,* it remains disturbingly common.

Ideation is defined as "the formation of a mental concept, image or thought." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 912 (32 ed. 2012). The Centers for Disease Control and Prevention defines "suicidal ideation" as "thinking about, considering, or planning suicide." https://www.cdc.gov/violenceprevention/suicide/definitions.html. VA defines "suicidal ideation" as "[t]houghts of engaging in suicide-related behavior," with "[v]arious degrees of frequency,

intensity, and duration."  DEP'T OF VETERANS AFFAIRS & DEP'T OF DEFENSE, VA/DOD CLINICAL PRACTICE GUIDELINE FOR ASSESSMENT AND MANAGEMENT OF PATIENTS AT RISK FOR SUICIDE 13 (June 2013) [hereinafter VA/DOD CLINICAL PRACTICE GUIDELINE].  Similarly, the *Diagnostic and Statistical Manual of Mental Disorders*, Fifth Edition, describes suicidal ideation as involving a "range . . . from a passive wish not to awaken in the morning or a belief that others would be better off if the individual were dead, to transient but recurrent thoughts of committing suicide, to a specific plan."  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 164 (5th ed. 2013).  At one end of the continuum is passive suicidal ideation, which consists of thoughts such as "wishing you would go to sleep and not wake up," *Self-harm, Suicide Ideation Tightly Linked in Iraq, Afghanistan Veterans*, VA RESEARCH CURRENTS (May 7, 2015), http://www.research.va.gov/currents/ spring2015/spring2015-18.cfm.  Further down that continuum is active suicidal ideation, i.e., "[t]hinking of killing [one]self," VA/DOD CLINICAL PRACTICE GUIDELINE at 29, including "thinking about specific ways to end one's life," *Self-harm, Suicide Ideation Tightly Linked in Iraq, Afghanistan Veterans*, VA RESEARCH CURRENTS (May 7, 2015), http://www.research.va.gov/currents/spring2015/spring2015-18.cfm.  Thus, suicidal ideation does not require suicidal intent, a plan, or prepatory behavior.  VA/DOD CLINICAL PRACTICE GUIDELINE at 29.  "Patients with active suicidal ideation *may have* the intent to act, a plan to act, both, *or neither*." *Id.* (emphases added).

In sum, both passive and active suicidal ideation are comprised of thoughts: passive suicidal ideation entails thoughts such as wishing that you were dead, while active suicidal ideation entails thoughts of self-directed violence and death.  *See id.* at 13, 29; *Self-harm, Suicide Ideation Tightly Linked in Iraq, Afghanistan Veterans*, VA RESEARCH CURRENTS (May 7, 2015), http://www.research.va.gov/currents/spring2015/spring2015-18.cfm.

The criteria for a 70% evaluation under § 4.130 lists "suicidal ideation" as a symptom VA deems representative of occupational and social impairment with deficiencies in most areas. *Schedule for Rating Disabilities: Mental Disorders*, 61 Fed.Reg. 52,695, 52,697 (final rule published Oct. 8, 1996).  Suicidal ideation appears only in the 70% evaluation criteria.  There are no analogues at the lower evaluation levels, *see Vazquez-Claudio*, 713 F.3d at 116 (tracking the increasing severity, frequency, and duration of panic attacks and memory loss across the various disability

levels). Additionally, there are no descriptors, modifiers, or indicators as to suicidal ideation in the 70% criteria (including no specific mention of "active" suicidal ideation, "passive" suicidal ideation, suicidal "intent," suicidal "plan," suicidal "prepatory behavior," hospitalization, or past suicide attempts). Thus, the language of the regulation indicates that the presence of suicidal ideation alone, that is, a veteran's thoughts of his or her own death or thoughts of engaging in suicide-related behavior, may cause occupational and social impairment with deficiencies in most areas.

### 3. The Board's Treatment of Evidence of Suicidal Ideation

Turning to the specifics of Mr. Bankhead's case, the record amply reflects recurrent suicidal thoughts and behaviors of varying severity, frequency, and duration. R. at 95, 114, 169, 181, 192-93, 205, 492, 613-14, 616, 657, 689, 691, 699, 703, 705, 711, 717, 737, 739, 855, 857, 865, 881, 899, 901, 1328-29; *see also* R. at 14-39. The Board acknowledged as much, explaining that "the record is replete with thoughts of death and suicidal ideation, ranging from passive thoughts to times when he reported thinking of drinking antifreeze and so extreme on one time that his wife felt the need to remove[] his guns." R. at 41.

The Board determined, however, that the veteran's "passive" suicidal ideation did not rise to the level contemplated in evaluations of 70% or 100% because he was "at sufficiently low risk of self-harm throughout the period," he had been "consistently treated on an outpatient basis during the period at issue" and there were "no instances where he was hospitalized or treated on an inpatient basis or domiciliary care," "his treating sources have considered his assurances that he would refrain from self-harm to be credible," and he "retained some social and occupational functioning." R. at 41-42. In adopting this analysis, the Board erred in several respects.

First, insofar as the Board required evidence of more than thought or thoughts to establish the symptom of suicidal ideation, it erred. *See* R. at 41-42. The Board erroneously grafted risk of self-harm onto the symptom of suicidal ideation listed in the criteria for a 70% evaluation, negatively impacting the Board's evaluation of Mr. Bankhead's service-connected major depressive disorder. R. at 41-42 (referencing the veteran's low risk of self-harm). The Secretary echoes the Board, arguing in his brief that the degree of social and occupational impairment resulting from suicidal ideation should be measured by the likelihood that a claimant would attempt self-harm, and, like the Board, equating a 70% evaluation with a high risk of actual self-harm. The Secretary argues that the

11

Board's decision should be affirmed because the veteran's "suicidal ruminations on death" did not involve an intent or plan that show that he had a high risk of self-harm. Secretary's Br. at 5-9.

By arguing that suicidal ideation, alone, without an intent or a specific plan to commit suicide, cannot result in deficiencies in social or occupational impairment contemplated by the 70% evaluation, the Secretary effectively tapers "suicidal ideation" from a broad continuum that encompasses both passive and active suicidal ideation into a narrow segment restricted to an intention to act or a specific plan to end one's life. But VA did not include in the criteria for a 70% evaluation the risk of actual self-harm. In fact, to the extent that risk of self-harm is expressly mentioned in § 4.130 at all, it is referenced in the criteria for a 100% evaluation as "persistent danger of hurting self," a symptom VA deemed to be typically associated with total occupational and social impairment. 38 C.F.R. § 4.130.

This is not to say that the Board was absolutely prohibited from considering Mr. Bankhead's risk of self-harm in assessing his level of occupational and social impairment. But the failure to differentiate between Mr. Bankhead's suicidal ideation, which VA generally considers indicative of a 70% evaluation, and his risk of self-harm, the persistent danger of which VA generally considers indicative of a 100% evaluation, resulted in conflation of distinct concepts, prevented the veteran from understanding the Board's weighing of that evidence, and frustrates judicial review in this case. *See Caluza*, 7 Vet.App. at 506; *Gilbert*, 1 Vet.App. at 52.

Second, the Board erred in finding, despite evidence that Mr. Bankhead's suicidal ideation was pervasive and chronic, that his suicidal ideation did not warrant assignment of a 70% evaluation because he had not been hospitalized or treated on an inpatient basis. R. at 41-42. This analysis imposes a higher standard than the criteria in the DC for mental disorders. *See Drosky v. Brown*, 10 Vet.App. 251, 255 (1997) (holding Board conclusions legally erroneous where they were based on factors outside and in excess of the evaluation criteria); *Massey v. Brown*, 7 Vet.App. 204, 207-08 (1994) (holding that the Board erroneously denied an increased evaluation claim by focusing on factors "almost entirely" outside the evaluation criteria); *Pernorio v. Derwinski*, 2 Vet.App. 625, 628 (1992) (concluding that the "Board's consideration of factors which are wholly outside the rating criteria provided by the regulations is error as a matter of law"). In *Drosky*, the Court held that the Board erred in finding a veteran not entitled to a higher evaluation because his enlarged heart was

12

not "unexpected, significant, abnormal or disabling." 10 Vet.App. at 255. The Court noted that, although the DC required a "definitely" enlarged heart, it did not also require an unexpected, significant, abnormal, or disabling enlargement. *Id.* The Court determined that the Board impermissibly rewrote the evaluation criteria to include factors wholly outside of those criteria. *Id.* And in *Massey,* as in Mr. Bankhead's case, the Board denied an increased evaluation in part because the veteran had not been hospitalized for his psychiatric condition. 7 Vet.App. at 207-08. The Court found that the Board erred in considering a factor wholly outside the evaluation criteria that exceeded the DC's standard for a higher evaluation. *Id.*

In considering whether Mr. Bankhead had been hospitalized, the Board introduced a factor not included in the 70% evaluation criteria and focused on the absence of that factor, rather than concentrating on the signs and symptoms listed in the 70% category and the type, frequency, severity, and duration of other signs and symptoms that Mr. Bankhead *actually experiences*, as contemplated by *Vazquez-Claudio* and *Mauerhan*. In those cases, the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) and this Court explained that the criteria in the General Rating Formula for Mental Disorders are not exhaustive and held that VA's focus in evaluating a service-connected mental disorder must be on the signs and symptoms actually experienced by the veteran, even those that are not expressly listed in the DC. *Vazquez-Claudio*, 713 F.3d at 116-17 (indicating that, "[r]eading §§ 4.126 and 4.130 together, it is evident that the 'frequency, severity, and duration' *of the veteran's symptoms* must play an important role in determining his disability level" and that "VA thus intended the General Rating Formula to provide a regulatory framework for placing veterans on the disability spectrum *based upon their objectively observable symptoms*" (emphasis added)); *Mauerhan*, 16 Vet.App. at 442 ("The Secretary's use of the phrase 'such symptoms as,' followed by a list of examples, provides guidance as to the severity of symptoms contemplated for each rating, in addition to *permitting consideration of other symptoms, particular to each veteran and disorder*, and the effect of those symptoms on the claimant's social and work situation." (emphasis added)).

In other words, although the mental disorders rating schedule provides leeway for VA adjudicators to consider symptoms a veteran experiences that are not listed in the schedule, VA is not at liberty to create evaluation criteria out of thin air in an individual case and then use the

absence of those criteria in the veteran's records to *deny* a particular mental disorder evaluation. *See Vazquez-Claudio,* 713 F.3d at 116-17; *Mauerhan,* 16 Vet.App. at 442. That is precisely what the Board did in this case in discounting Mr. Bankhead's suicidal ideation based on a lack of hospitalization or inpatient treatment, a factor wholly outside the evaluation criteria. *See Drosky*, 10 Vet.App. at 255; *Massey*, 7 Vet.App. at 207-08; *Pernorio*, 2 Vet.App. at 628.

Finally, the Board impermissibly melded the criteria for 70% and 100% evaluations under § 4.130. Specifically, the Board determined that Mr. Bankhead's suicidal ideation did not warrant an evaluation greater than 50%, despite frequent and chronic suicidal ideation, because the record reflected that the veteran "still retained some social and occupational functioning." R. at 42. Although a 100% evaluation under § 4.130 requires total occupational and social impairment, a 70% evaluation requires only occupational and social impairment with deficiencies in most areas. 38 C.F.R. § 4.130. Therefore, to the extent that the Board denied a 70% evaluation for service-connected major depressive disorder on the basis that the veteran did not exhibit total occupational and social impairment–the level required for a 100% evaluation–it erred in applying a standard that exceeded that set forth in the relevant evaluation criteria. *See Pernorio*, 2 Vet.App. at 628.

To be clear, although the Court's review of the Board decision has heretofore focused on the Board's treatment of record evidence of suicidal ideation in denying an evaluation for service-connected major depressive disorder in excess of 50%, the presence or lack of evidence of a specific sign or symptom listed in the evaluation criteria is not *necessarily* dispositive of any particular disability level, *see Vazquez-Claudio*, 713 F.3d at 115; *Mauerhan*, 16 Vet.App. at 442, even though, as noted, the Federal Circuit in *Vazquez-Claudio* found it pertinent that the severity, frequency, and duration of a symptom such as memory loss could be tracked through several disability levels, 713 F.3d at 116. In any event, however, VA must engage in a holistic analysis in which it assesses the severity, frequency, and duration of the signs and symptoms of the veteran's service-connected mental disorder; quantifies the level of occupational and social impairment caused by those signs and symptoms; and assigns an evaluation that most nearly approximates that level of occupational and social impairment. *See Vazquez-Claudio*, 713 F.3d at 115-17. Where, as here, the Board fails to adequately assess evidence of a sign or symptom experienced by the veteran, misrepresents the meaning of a symptom, or fails to consider the impact of the veteran's symptoms as a whole, its

reasons or bases for its denial of a higher evaluation are inadequate.  *See Caluza*, 7 Vet.App. at 506; *Gilbert*, 1 Vet.App. at 52; *see also Mittleider*, 11 Vet.App. at 182.

### 4.  Staged Evaluations

Different evaluations may be assigned for distinct periods, a practice known as staged evaluations.  *Fenderson v. West*, 12 Vet.App. 119, 126 (1999).  This practice "accounts 'for the possible dynamic nature of a disability while the claim works its way through the adjudication process.'"  *Hart v. Mansfield*, 21 Vet.App. 505, 509 (2007) (quoting *O'Connell v. Nicholson*, 21 Vet.App. 89, 93 (2007)); *see also Reizenstein v. Shinseki*, 583 F.3d 1331, 1335 (Fed. Cir. 2009); 38 C.F.R. § 4.1 (2016) ("Over a period of many years, a veteran's disability claim may require reratings in accordance with changes in . . . his or her physical or mental condition.").

The Board acknowledged that Mr. Bankhead "experience[d] fluctuations in the manifestation of his service-connected psychiatric disability," including "some improvement in symptoms" recently, but concluded that staged evaluations were not appropriate because there were "no distinct periods of time during the appeal period[] when the disability varied to such an extent that a rating greater or less than those assigned would be warranted."  R. at 43.  The Board explained:

> [W]hile the [November 2014] VA examiner described mild symptoms, he also reported that the [v]eteran described crying in his sleep, poor memory, and irritability and agitation on a regular basis.  In light of these symptoms and the fact that psychiatric disabilities may have temporary or episodic improvement, the Board does not assign a lower staged rating.  Accordingly, a 50[%] evaluation, but no higher, is granted for the entire period on appeal.

*Id*.

Although the Board articulated why it was not assigning a staged evaluation *lower* than 50%, it did not explain why it was not assigning a staged evaluation *greater* than 50% for any period on appeal.  As Mr. Bankhead points out, Appellant's Br. at 22-23, the record contains evidence that reflects a possible increase in the severity of psychiatric symptoms between February 2012, when he had an outburst of anger that almost required police intervention, R. at 199, and February 2013, when he brandished knives and threatened to decapitate his son, R. at 166.  These incidents, which the Board described as "isolated" and "out of character," R. at 42, demarcate a distinct period of time where the veteran appears to have experienced impaired impulse control and violent outbursts of anger, symptoms that may support an evaluation greater than 50%.  *See* 38 C.F.R. § 4.130.  The

Board was therefore required, at a minimum, to explain why that apparently increased symptomatology did not warrant the assignment of a staged evaluation greater than 50% for that period, and its failure to adequately address that issue constitutes error. *See Hart*, 21 Vet.App. at 510-11.

### 5. Remedy

Having concluded that the Board erred in evaluating the veteran's service-connected major depressive disorder, the Court must now determine the appropriate remedy for those errors. Although Mr. Bankhead argues that reversal of the Board's denial of an evaluation in excess of 50% for that mental disorder is warranted, *see* Appellant's Br. at 15-22; Reply Br. at 1-7, the Court concludes that remand, not reversal, is the appropriate remedy where, as here, the Board has provided inadequate reasons or bases for its decision and additional factfinding and weighing of the evidence is necessary to make a decision on the claim. *See Deloach v. Shinseki*, 704 F.3d 1370, 1381 (Fed. Cir. 2013); *Tucker v. West*, 11 Vet.App. 369, 374 (1998) (holding that remand is the appropriate remedy "where the Board has incorrectly applied the law, failed to provide an adequate statement of reasons or bases for its determinations, or where the record is otherwise inadequate"). Accordingly, the Court will remand the issue of entitlement to an evaluation in excess of 50% for service-connected major depressive disorder so that the Board can adequately address the record evidence of suicidal ideation and the issue of entitlement to staged evaluations.

### B. TDIU

Mr. Bankhead next argues that the Board's reasons or bases for its decision were also inadequate because it did not address the reasonably raised issue of entitlement to TDIU. Appellant's Br. at 24-26; Reply Br. at 8-9. The Secretary disputes that contention and responds that the evidence of record suggested, at most, occupational impairment due to service-connected major depressive disorder, not unemployability. Secretary's Br. at 15-16. The Court agrees with the Secretary.

The Board must consider all issues either expressly raised by the claimant or reasonably raised by the evidence of record. *Robinson v. Peake*, 21 Vet.App. 545, 552 (2008), *aff'd sub nom. Robinson v. Shinseki*, 557 F.3d 1355 (Fed. Cir. 2009). The issue of entitlement to TDIU is reasonably raised when "a veteran submits evidence of a medical disability and makes a claim for the highest rating possible, and additionally submits evidence of unemployability." *Roberson v.*

*Principi*, 251 F.3d 1378, 1384 (Fed. Cir. 2009); *see also Comer v. Peake*, 552 F.3d 1362, 1367 (Fed. Cir. 2009) (holding that entitlement to TDIU "is implicitly raised whenever a pro se veteran, who presents cogent evidence of unemployability, seeks to obtain a higher disability rating"). *Roberson* and *Comer* dictate that entitlement to TDIU is not reasonably raised unless the record contains evidence of unemployability, either submitted by the veteran or developed by VA.

Contrary to Mr. Bankhead's argument, the record in this case does not contain evidence of unemployability sufficient to reasonably raise the issue of entitlement to TDIU. The September 2010 VA examination report that the veteran cites in support of his argument indicates only that he retired from the USPS and that, during his 22 years of employment there, he was a "loner," had "occasional" problems with coworkers that "a couple of times" nearly resulted in fights, and called in sick more frequently towards the end of his career "due to a lack of motivation to attend work" and out of disillusionment with his superiors and coworkers. R. at 612. Although those reported problems at work may reflect occupational impairment due to service-connected major depressive disorder, they do not suggest unemployability or otherwise indicate that a service-connected disability may have rendered the veteran unable to secure or follow a substantially gainful occupation. Nor did the examiner mention unemployability at any point in his report. *See* R. at 618 (finding that the veteran's service-connected mental disorder caused "signs and symptoms that are transient or mild and decrease work efficiency and ability to perform occupational tasks only during periods of signifcant stress").

Because Mr. Bankhead has not identified any evidence of record suggesting that his service-connected mental disorder rendered him unemployable, the Court concludes that he has failed to carry his burden of demonstrating that the issue of entitlement to TDIU was reasonably raised by the evidence of record and that the Board erred in failing to adjudicate that issue. *See Hilkert v. West*, 12 Vet.App. 145, 151 (1999) (en banc) (holding that the appellant has the burden of demonstrating error), *aff'd per curiam*, 232 F.3d 908 (Fed. Cir. 2000) (table); *see also Robinson*, 21 Vet.App. at 553 ("The Board commits error only in failing to discuss a theory of entitlement that was raised either by the appellant or by the evidence of record.").

### III. CONCLUSION

Upon consideration of the foregoing, the portion of the Board's April 28, 2015, decision denying an evaluation in excess of 50% for major depressive disorder is SET ASIDE and the matter is REMANDED for readjudication consistent with this decision.